[Civ. No. 3654. Fourth Dist. Apr. 27, 1948.]

In re FRED HALAMUDA, a Minor. ARTHUR A. FLA-KOLL, as Chief Probation Officer, etc., Respondent, v. FRED HALAMUDA et al., Appellants.

Charles E. Burch, Jr., for Appellants.

James Don Keller, District Attorney and Bertram Mc-Less, Jr., Deputy District Attorney, for Respondent.

MARKS, J.—This is an appeal from a judgment of the juvenile court of San Diego County freeing Fred Halamuda, a child of about 3 years of age, from the custody and control of his parents, Fred Halamuda II, his father, and Erma Halamuda, his mother. We will hereafter refer to the father as Halamuda and to the minor as Fred.

Three grounds are urged for a reversal of the judgment, namely, (1) That the petition to free Fred from the control of his parents was prematurely filed in that "the period of one full year continuously immediately prior to the filing of a petition" had not expired since Fred had been declared a ward of the juvenile court as required by subdivision (b) of section 701 of the Welfare and Institutions Code; (2) that the evidence was insufficient to support the judgment as the hearing was informal and no sworn testimony or verified doc-

uments were presented; (3) that there was no evidence of any cruelty towards or neglect of Fred by his mother.

■ Fred was made a ward of the juvenile court on February 26, 1946, and the petition to free him from parental control was filed on February 26, 1947, it being conceded by both parties that the statement in the judgment to the effect that the petition to free Fred from parental control was filed on February 27, 1947, was a typographical error. Section 701 of the Welfare and Institutions Code provides in part as follows:

"The jurisdiction of the juvenile court extends also to any person who should be declared free from the custody and control of either or both of his parents. The words 'person who should be declared free from the custody and control of either or both of his parents' shall include any person under the age of 21 years who comes within any of the following descriptions: . . .

"(b) *Who has been cruelly treated or neglected* by either or both of his parents, if such person has been a ward of the juvenile court, and such parent or parents deprived of his custody because of such cruel treatment or neglect, for the period of one year continuously immediately prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."

In support of their argument that the petition was filed one day too soon, appellants rely on section 3257 of the Political Code providing that a year is a period of 365 days; section 3258 of the Political Code providing that a day is the period of time between one midnight and the following midnight, and section 12 of the Political Code, 10 of the Civil Code, and 12 of the Code of Civil Procedure all of which provide that the time in which an act is to be done is computed by excluding the first day and including the last unless the last day is a holiday when it is to be excluded.

The case of *Cosgriff* v. *Election Commissioners,* 151 Cal. 407 [91 P. 98], seems to be decisive of this question. The statute under consideration there provided that a certain petition might be filed "not more than fifty days nor less than twenty days before the day of election" which was on November 6, 1906. It was held that a petition which was offered for filing on October 17, 1906, was in time and should have been filed, the court saying:

"The fractions of the days are no more taken into consideration than are the fractions of the seconds. The consequence is that every day, and every part of that day is, by this rule, *one day before* every part of the succeeding day. The last moment of any day is, in contemplation of law in such cases, one day before the first moment of the next day, although the elapsed time is infinitesimal. . . . So, by counting the consecutive days backward from November 6th, it will be found that October 17th was twenty days, and if twenty days, then not less than twenty days, before November 6th. This is what is contemplated by section 12 of the Political Code, declaring that in computing time by days, the first day is to be excluded and the last day included. Excluding November 6th, the first day, we find October 17th to be the twentieth day, or the last day of the period, and as it is to be included in the count, it must be counted as part of the period."

Other statutes are similarly construed in the following cases: *Estate of Espinosa,* 179 Cal. 189 [175 P. 896] ; *Antelope Valley Union H. S. Dist.* v. *McClellan,* 55 Cal.App. 244 [203 P. 147] ; *Galusha* v. *Meserve,* 58 Cal.App. 174 [208 P. 348] ; *Kelly* v. *State Personnel Board,* 31 Cal.App.2d 443 [88 P.2d 264].

On authority of these cases we conclude the petition was not prematurely filed.

The procedure in the hearing in the juvenile court was most informal as is usual in such proceedings. Halamuda had filed a written appearance and waiver of service of citation but was not personally present at the hearing. Mrs. Halamuda had been served with citation and was present with her mother. A deputy district attorney and two assistant probation officers were present. None of these persons were sworn as witnesses but all were interrogated by the juvenile court judge and made unsworn statements to him. There was before the court a long and detailed report from the probation officer of San Diego County, and several other reports from him. There was also a report from the probation officer of Los Angeles County where this proceeding was instituted and from which county it was transferred to San Diego County.

It is now argued that there is no evidence supporting the judgment as it rests solely upon unsworn statements and unverified documents and does not comply with the provisions of section 784 of the Welfare and Institutions Code which per-

mits the juvenile court judge to hear the case and to dispose of it "after full and careful consideration of all the evidence presented." It is urged that the word "evidence" is used in its legal sense of including only sworn testimony and authenticated documents that are admissible in a court of law. In support of this argument the appellants rely chiefly on *In re Hill*, 78 Cal.App. 23 [247 P. 591].

Sections 639 and 640 of the Welfare and Institutions Code require the probation officer to be present at the hearing and that he "shall furnish to the court such information and assistance as the court may require" (§ 640) and to "inquire into the antecedents, character, family history, and environment of every person brought before the court . . . and shall make his report in writing to the judge thereof." (§ 639.) The report must be filed and there is no requirement that it be verified. It is apparent that the *inquiry* required must be from persons purporting to have knowledge of facts so that the report based on such inquiry must, to a certain extent, be based on hearsay. This seems to be contemplated by the section.

Section 1887 of the Code of Civil Procedure provides that there are two kinds of writings, public and private. Section 1894 of the same code divides public writings into four classes one of which is judicial records. Section 1904 of the Code of Civil Procedure provides "A judicial record is the record of the official entry of the proceedings in a court of justice, or of the official act of a judicial officer, in an action or special proceeding." The next section provides that a judicial record of this state may be proved by producing the original, and subdivision 6 of section 1918 of the Code of Civil Procedure is to the same effect as to other official documents.

With these provisions in mind we have no hesitancy in holding that when the unverified report of the probation officer was filed it became a judicial record that the juvenile court judge should consider in deciding the case. As the judgment recites that it was so considered, its contents must be regarded as legal evidence.

The foregoing conclusion is fortified by *In re Jones*, 34 Cal. App.2d 77 [93 P.2d 185], where it is said:

"It is true the hearing was not conducted with all the strict formality of a criminal proceeding; but it was not necessary to do so because as frequently pointed out by the courts, proceedings of the juvenile court in dealing with cases of

dependent children are not of a criminal nature. (*In re Edwards*, 99 Cal.App. 541 [278 P. 910, 290 P. 591], citing earlier cases.) Such court operates under special powers, in conformity with procedure prescribed therefor by the juvenile court law, which authorize the consideration by the juvenile court, in cases of this kind, of the written reports and recommendations of the probation officer, which under said law are open to inspection of the interested parties. (Secs. 638, 639 and 640, Welfare and Institutions Code.) In other words, from its very nature and because of necessary qualifications for doing the work for which it is intended, the juvenile court was not designed as a trial court in the ordinary sense; and its method of operation is very different from the one governing in the trial of criminal cases, mainly because technicalities and formalities are largely eliminated. (*People* v. *Superior Court*, 104 Cal.App. 276 [285 P. 871].)''

█ The report of the probation officer shows acquaintance with this case since April, 1945, when he states:

''At this time, both Mrs. Halamuda and the neighbors testified that the father frequently beat the little boy, that he slapped him for trifles, sometimes with a stick or a blunt end of a knife, because the child's manner or attitude annoyed him. The mother admitted that the boy was so afraid of his father that he would sit quietly for hours when the father was in the home, apparently afraid to move or to attract the older man's attention for fear of punishment.''

Halamuda was twice arrested for cruelly beating Fred and on one occasion was found guilty and fined either $100 or $125. It is apparent that Halamuda's dislike of Fred arose at least partially from his questioning the boy's paternity. The report further states that Mrs. Halamuda ''admits that Fred is aware of this (hatred), when she says, as she did on occasion, 'Fred will be playing happily until the minute his father walks into the room. Then it's just as if a curtain dropped over his eyes, and his face is perfectly blank.' Mrs. Halamuda's mother, Mrs. Blanche Gargulo, states that in her opinion, the mother is as eager to be relieved of the problems and responsibilities which Fred's presence in the home present, as is the father. Mrs. Gargulo said that Mrs. Halamuda wished to relinquish Fred for adoption at the time of his birth, but that on her insistence, she did not do so. So unstable is the attitude of the Halamudas toward their son, that they have relinquished him for adoption on two occasions and have later voided the relinquishment. . . . The parents seem to be incapable of

reaching any final decision concerning themselves or their child, they alternately reject and accept Fred in such a fashion that the child feels absolutely no security in his own home. His personality and behavior have been seriously affected by the instability which he has experienced.''

It is further stated in the report:

''Recently, Fred has been given to outbursts of hysterical crying and temper tantrums, a manifestation of emotional disturbance, which was not present before. It is increasingly evident that great emotional damage has been done to the child, and that it is imperative that he be so situated that he is able to receive the stability and security due him. The father through his attitude and actions has made a positive contribution to the unfitness of the home. Equally, the mother has contributed to the situation in a negative manner through her refusal to remove the child voluntarily from a harmful environment, and her refusal or inability to protect Fred from the effects of his father's rejection. The mother is too unstable and too ineffectual to create and execute any constructive plan for the successful reestablishment of the family unit.''

The report contains many other instances of the mistreatment of Fred, including scars on his back from beatings, and conclusively shows that his parents cannot provide a fit and proper home for him.

Our conclusion that the report of the probation officer was legal evidence before the court to be considered on the hearing makes it unnecessary to consider the other question argued, namely, the competence as evidence of the unsworn statements of the other persons present at the hearing.

It is argued on behalf of Mrs. Halamuda that the evidence is insufficient to support the portion of the judgment depriving her of the custody of Fred as there is no evidence of any cruelty towards or abuse of the boy by her. This is true insofar as physical acts of cruelty are concerned but cruelty may be inflicted mentally by failure to act as well as by physical abuse. She could not aid Fred and did not protect him from the cruel and inhuman treatment of her husband. She could not and did not provide a home for him where he could live peacefully and grow into normal youth. While her faults were negative in this respect in failing to act, the results on the child were equally bad. Further, it should be remembered that a minor may be freed from parental custody and control

because of neglect as well as because of cruelty. The evidence points to serious neglect of the welfare of Fred by his mother. Her weakness and instability of character were repeatedly pointed out in the report and it is very evident that neither parent could furnish a fit home for the boy and that the juvenile court judge was confronted with a situation where he could do nothing else than free Fred from the parental control of both parents for the protection and welfare of the child which is the ultimate result to be aimed at in all juvenile court proceedings.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.