126 Cal.App.3d 193 (1981)
178 Cal. Rptr. 694
In re EDWARD C. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
EDMOND C. et al., Defendants and Appellants.
Docket No. 49728.
Court of Appeals of California, First District, Division Three.
November 30, 1981.
*196 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Kathleen Kahn, Deputy State Public Defender, for Defendants and Appellants.
Louis P. Bergna, District Attorney, and Robert J. Masterson, Deputy District Attorney, for Plaintiff and Respondent.
OPINION
BARRY-DEAL, J.
Appellants, Edmond and Deborah C., appeal from judgments of the juvenile court declaring their children, Eric and Edward, dependent children of the juvenile court under section 300, subdivision (a), of the Welfare and Institutions Code[1] and removing the children *197 from their custody and control pursuant to sections 361 and 362 of that code.
Appellants assert (1) that there is insufficient evidence to support the finding that the minors come within the provisions of section 300 or the finding that the minors should be removed from appellants' custody; (2) that even though the jurisdiction orders are sustained, the disposition orders must be set aside because they do not contain a reunification plan; and (3) that refusal to grant a continuance after the filing of amended petitions was prejudicial error.
We affirm the judgments.

Facts
(1) As an appellate court, we must review the record in the light most favorable to the judgment below, and we must indulge in all reasonable inferences to support the findings of the juvenile court. (In re Luwanna S. (1973) 31 Cal. App.3d 112, 114 [107 Cal. Rptr. 62].) With this basic rule in mind, we set out the facts from the evidence adduced at the combined jurisdiction and disposition hearing.
Appellants have three children: Eric (born Jan. 21, 1971), Marlee (born May 31, 1972), and Edward (born Nov. 7, 1973).
In 1973 the family was living in Idaho, as was Mrs. R., the maternal grandmother. Dependency proceedings were instituted there for Marlee, 11 months old at the time, because she was malnourished and had suffered a probable concussion of questionable origin. She was adjudged a dependent child and placed in the home of Mrs. R., who adopted Marlee through formal proceedings in Idaho in 1977. The psychiatric evaluations ordered for the appellants were apparently never made.
Appellants, with Eric and Edward, returned to California to live. In 1975, in Santa Clara County, the two boys were placed in protective custody because there was no food in the home, the home was in a disheveled condition, and because Eric, then four, had received numerous marks and welts as a result of excessive discipline by the father throughout the night. A petition requesting that the boys be adjudged dependents and placed in a foster home was sustained. In July 1977 the *198 foster family moved away, and the boys were allowed to return to appellants on a 60-day trial basis. Appellants refused counseling, offered minimal cooperation, and failed to maintain regular contact with the probation department. Nevertheless, dependency proceedings for the boys were terminated on December 28, 1978, on the recommendation of the probation officer, who expressed some misgivings.
In August 1979 the maternal grandmother, believing that the father had permanently left the home and hoping that the children could be reacquainted, allowed Marlee an extended visit with her mother and two brothers in California. At this time Eric was nine, Marlee was nearly eight, and Edward was six. The grandmother had intended to see how things were going at Christmas, but was unable to return to California until March. In the interim, the father had returned to the home in January or early February.
During her two-week visit in March 1980, the grandmother observed the father disciplining the three children by hitting them with a leather strap, looped over. Although the boys were spanked a few times with clothing on, Marlee was beaten at least a dozen times, usually on her bare flesh. The boys witnessed Marlee's whippings, heard her cry, and listened to their father, while administering the beating, explain to the children that he was doing it because God wanted him to and that it was Biblically ordained. The grandmother was not allowed near the children except at mealtime, so she was unable to see whether Marlee was severely injured.
The grandmother testified that one night Marlee was strapped three times during the night for wetting the bed, and she could hear Marlee screaming. This incident was corroborated by a neighbor whose call to the police for investigation was ineffectual.
There were other forms of discipline and parental control during the two-week period that the grandmother was with appellants. Marlee was made to sleep in her underwear on a plastic sheet on the floor with no bedding in 60 degree weather as punishment for wetting. The children were made to stand in a corner for long periods and were lectured about God at mealtime. One night, after three hours of dissertation by the father, the dinner was cold and the children fell asleep without eating. After school the children were not allowed to go outside the home, to visit friends, or to have friends visit them.
*199 A neighbor testified about her concern for the children after the father's return to the household. She and her family had been routinely awakened in the middle of the night with sounds of the whippings and the children crying out in pain.
After one severe beating of Marlee prompted by her inability to recall what she had learned in church, the grandmother observed blood on Marlee's underpants. This incident firmed the grandmother's resolve to remove Marlee from appellants' household. She called the police for assistance and requested that they look at all three children for signs of abuse. A visual check of Marlee revealed numerous abrasions, bruises, and lacerations on her buttocks, legs, and arms; she was taken into protective custody. (Apparently, there were no significant bruises on the boys.) A petition was filed concerning Marlee on March 26, and she was detained in the Children's Shelter pending a jurisdictional hearing.[2]
Petitions were filed for Eric and Edward after an incident on March 27 when a deputy probation officer observed the father strike Eric while they were sitting in the lobby of the probation department. The boys had been taken there so that Eric could explain before the detention hearing that Marlee's bruises were the result of a falling-down game at school. The probation officer testified that the boys were sitting in one area and the father in another when the father suddenly stood, approached Eric, pulled him from a sitting position, and struck him on the left lower back of his body. The father testified that he was punishing Eric for flying a paper airplane, and Eric confirmed his father's explanation. The deputy saw no such object.
When Eric and Edward were first interviewed in the Children's Shelter, they told Nanci Bent, the investigating deputy, that they did not want to return to their parents' home because their father whipped them too much and too hard, and they feared he would continue to do so. After a visit from their father, they told Ms. Bent they wished to return home because their father told them that it's not God's will for the family to be apart and they were disobeying God by not wanting to go home.
Dr. Nancy Alvarez, M.D., testified about Marlee's injuries (which are also presented in graphic detail in exhibits reviewed by this court). *200 The bruises, of different ages and different depths, were exacerbated by open sores. Dr. Alvarez considered Marlee an abused child. Her examination of Eric on March 28 revealed a superficial bruise on his back; Edward had a few small bruises on the left upper thigh and lower leg, which were not overly significant for a child his age. All three children had insect bite lesions.
The father, admitting that he had "spanked" the children since his return home, denied that he had caused any bruises on them or that he had even noticed any injuries other than insect bites. He proclaimed that he loved and treated his children equally and that God directed his discipline of them. Counseling would be useless since he had given his heart to the Lord. The mother did not testify, but she informed the investigating officer that she supported her husband's manner of discipline. The record reflects only one time when she interceded on behalf of any of the children  in 1975 when Eric, then four, was beaten on and off during the night because he was unable to read the numbers on a deck of cards.
At the conclusion of the dependency hearing on April 18, 1980, the court found (1) that Marlee's injuries reflected infliction upon a child of unjustifiable physical pain and suffering as described in Penal Code section 273a; (2) that those injuries established the imposition of cruel and inhuman corporal punishment or injury resulting in a traumatic condition as described in Penal Code section 273d; (3) that there had been presented competent professional evidence that the injuries were of such a nature as would ordinarily not be sustained except as a result of unreasonable or neglectful acts or omissions of either parent or guardian, as described in Welfare and Institutions Code section 355.4; and (4) that there was clear and convincing evidence as it related to each of the petitions on behalf of the minors; the allegations of the petitions filed April 14, 1980,[3] were found to be true and the minors to come *201 within the provisions of Welfare and Institutions Code section 300, subdivision (a), and adjudged dependents of the court. The court found that the return of the minors to the physical custody of the parents would be detrimental to the welfare of the minors, and they were committed to the care, custody, and control of the probation officer for suitable foster or relative home placement. The parents were ordered to be involved in a program of counseling for as long as deemed necessary by the supervising probation officer, such program to include a psychological evaluation.

I. Sufficiency of the Evidence

(2a) Appellants assert that their fundamental right of parenting is constitutionally protected and, thus, state intrusion into the privacy of the family is precluded in the absence of substantial evidence of actual or imminent harm to Eric and Edward.[4] They acknowledge that the mistreatment of Marlee justified her removal from their home, but contend that the evidence is insufficient to support a finding that Edward and Eric suffered any physical or psychological injury resulting from their discipline or home conditions.
(3) Our Supreme Court in In re Angelia P. (1981) 28 Cal.3d 908 [171 Cal. Rptr. 637, 623 P.2d 198] has recently reconsidered the parental right doctrine in light of the emerging primacy of another consideration  the child's well-being. (Id., at p. 916.) The court reasoned that the "parental preference" and the "child's best interests" standards are usually compatible, but when the rights of the parents conflict with those of the child, "`... the legal system should protect the child's interests. Not only is the child a helpless party but the parents should suffer the consequences of their inadequacy rather than the child.'" *202 (Id., at pp. 916-917, quoting from Wald, State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights (1976) 28 Stan.L.Rev. 625, 638, fn. omitted.) Thus, in any proceeding to remove a child from the parents, either temporarily or permanently, the court must balance the fundamental rights of the parents against the fundamental rights of the child.
Appellants further contend that the First Amendment to the United States Constitution, protecting freedom of religion, severely limits the power of the state to interfere with the parental right to direct the upbringing of their children. They correctly argue that the state must show that the parent's religious choices do jeopardize the health or safety of the child and that the state cannot override parental choice just because it runs counter to the tastes or lifestyles of the majority.
Mistreatment of a child, however, is not privileged because it is imposed in the guise of freedom of religious expression. (See Prince v. Massachusetts (1944) 321 U.S. 158, 166-167 [88 L.Ed. 645, 652-653, 64 S.Ct. 438].) Whether discipline is excessive or a lifestyle is harmful to the child must be measured in the light of an objective standard of reasonableness under all the circumstances. (See In re Corrigan (1955) 134 Cal. App.2d 751, 756 [286 P.2d 32].)
(2b) With these principles in mind, we must determine whether there was substantial evidence to support the trial court's finding that Eric and Edward were dependent children "in need of proper and effective parental care or control" and who have no parent "willing to exercise or capable of exercising such care or control" under the standards of section 300, subdivision (a).
(4) Few cases have attempted to define "proper and effective parental care or control" (see In re J.T. (1974) 40 Cal. App.3d 633, 637 [115 Cal. Rptr. 553]), since in most cases, as in this case, it is easier to describe what is not proper parental care and control. It is clear, however, that the term is determined by external standards and that "[i]t is the conduct of the parent which determines whether he or she is capable of exercising proper parental control." (In re Corrigan, supra, 134 Cal. App.2d 751, 756.)
(2c) The evidence overwhelmingly supports the finding that appellants' home was an unfit place for Marlee by reason of the father's *203 cruel and inhuman corporal punishment of her. Such evidence is admissible on appellants' exercise of proper and effective control of Eric and Edward. (§ 355.5.) The severe, repeated beating of Marlee for such childhood infractions as bed wetting and inability to remember a Sunday school lesson amply demonstrate the father's pitiless and unreasonable approach to discipline. The court could reasonably infer that the father, with Marlee removed, would substitute either one or both of the boys as an object of his ruthless drive for religious perfection by some standard known only to him. (See In re Jeannie Q. (1973) 32 Cal. App.3d 288, 304 [107 Cal. Rptr. 646]; In re Luwanna S., supra, 31 Cal. App.3d 112, 115; In re Biggs (1971) 17 Cal. App.3d 337, 342 [94 Cal. Rptr. 519]; Review of Selected 1976 California Legislation, Juvenile Law; dependency hearings (1977) 8 Pacific L.J. 425-427.)
There is additional substantial evidence relating to Eric and Edward. Both boys testified at the hearing about past beatings and their change of mind on returning home. By observing their tone of voice, manner of speaking, and physical movements, the court was able to assess the sincerity of their stated desire to return home and the degree of apprehension they felt about their father. The court could infer from the 1975 beating of Eric, the boys' testimony of other whippings when they were "bad," and the recent unprovoked hitting of Eric that the father's erratic disciplining would continue with the boys. The father's testimony also supported the inference.
Furthermore, there is evidence that the boys not only watched the vicious treatment of their eight-year-old sister, but were admonished that the beatings were on the command of the Lord. It is difficult to conceive that the brothers could not be emotionally or psychologically scarred by witnessing the constant acts of cruelty upon their sister and upon each other; it is reasonable to infer that continued exposure to the threat of physical force will inhibit the healthy emotional development necessary to a progression from childhood to independent manhood. (See In re Lisa D. (1978) 81 Cal. App.3d 192, 197 [146 Cal. Rptr. 178]; In re Biggs, supra, 17 Cal. App.3d 337, 342; In re Corrigan, supra, 134 Cal. App.2d at p. 756.)
Appellant raises the issue of insufficiency of the evidence to support the finding of detriment[5] separately from the issue of dependency. If *204 this were a case where the evidence revealed a parental willingness to remedy the causes supporting the finding of dependency, a separate discussion would be appropriate. In the case before us, however, the same facts and inferences support both findings.
There is substantial evidence of actual and imminent physical and psychological harm to support the court's findings that the minors are dependent children who have no parent willing to exercise or capable of exercising proper and effective parental control and that return of the minors to the physical custody of their parents would be detrimental to their welfare.

II. Plan for Reunification of Family

(5a) Rule 1376, California Rules of Court, provides in pertinent part; "(b) ... If a recommendation is made to remove the minor from the home, the ... social worker shall also include in the social study a recommended plan for reuniting the minor with the family.... [¶] (d) ... In any judgment and order of disposition, the court shall state the social study has been read and considered by the court, and, where appropriate, that the plan for family reunification has been discussed with the parents."[6]
In the case before us, the probation report contained the following: "The undersigned does not question that [appellants] care for their sons. If they could curtail the persistent efforts they have used on this Department to get their children returned to them, and to seeking ways of becoming effective parents, consideration might be given to returning the boys home.
*205 "Until [appellants] alone can show some cooperation in working towards proper care and discipline of the children, it is felt the boys would be more effectively cared for in a foster home, due to the excessive discipline administered to them by their father."
The report also recommended "[t]hat the parents be involved in a counseling program for as long as deemed necessary by the supervising Probation Officer."
Appellants contend that the above provisions do not comply with the requirements of rule 1376(b), that the court made no effort to meet the requirement of rule 1376(d), and, therefore, that the order removing the children from their parents must be reversed. They assert that the controversy boils down to a difference of opinion between appellants and the probation department about the permissible degree of discipline and that the probation department has never explained what discipline would be acceptable to them. They urge that "seeking ways of becoming effective parents" is a vague recommendation and does not tell them what they must do to regain custody of their children.
(6) We are cognizant of the legislative and judicial concern for family relationships and for the need to strengthen family ties. (§ 202; In re Jeannie Q., supra, 32 Cal. App.3d 288, 295-297.) We do not think, however, that the Legislature has mandated, through the Judicial Council, a mechanical approach to a reunification plan for a family. Such a plan must be appropriate for each family and be based on the unique facts relating to that family.
(5b) Appellants have been through dependency proceedings three times. Because of the father's brutality, Marlee has been removed from the home twice, and Eric was removed from the home in 1975. Now both Eric and Edward are being removed to avert their further victimization. Three proceedings must surely have alerted the father to the inappropriateness of his disciplining techniques. Yet the father has shown no remorse, has persistently denied physical abuse of the children, has denied seeing bruises on Marlee, has declared his equal treatment of the children according to the tenets of his beliefs, and has disclaimed any need for counseling other than with the Lord. The mother has supported the father in his beliefs. After the first two proceedings, appellants showed no willingness to cooperate with the probation department and, indeed, failed even to apprise the department of their whereabouts for the most part.
*206 In the face of the appellants' massive denial of any wrongdoing and refusal to participate in any plan for counseling, a detailed plan for reunification would have been a futile gesture to satisfy mechanically the provisions of rule 1376. The recommendation for counseling and the court order for counseling were sufficient to apprise appellants of the steps needed for reunification of the family. We find no error.

III. Denial of Request for Continuance

(7) Appellants contend that they had an absolute right to a continuance under section 353 and that the court's denial of their request for a continuance on April 16, the day before the hearing, was prejudicial error.
The initial petitions, filed on March 31, 1980, alleged that Eric and Edward were minors who came within the provisions of section 300, subdivision (d), describing a minor "[w]hose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents...." Summarized, the specific factual allegations were (1) that Marlee had been placed in protective custody on March 24 because of her injuries; (2) that the boys had been placed in protective custody on October 28, 1975, because the home was disheveled and lacking food and Eric had been excessively disciplined by his father, and they had been in a foster home for one and a half years; and (3) that on March 28, 1980, the boys had stated that they did not wish to go home because of excessive discipline by the father.
The parents demurred to the petitions on April 1, and the district attorney filed amended petitions on April 2 alleging jurisdiction under section 300, subdivision (a), and substantially the same facts except for the last paragraph of each petition, which was expanded to state that the minor "did not wish to return home because ... excessive discipline was routinely inflicted on him by his father, resulting in severe family conflict."
On April 3 the parents filed a second demurrer to the petitions, which was denied by a referee. The court on April 10 again heard argument on the issue and, noting that technically a demurrer will not lie in juvenile proceedings, held that the pleadings were sufficient. Nevertheless, on April 14 the district attorney filed amended petitions, alleging jurisdiction under section 300, subdivision (a), and adding a new factual allegation that between January 1980 and March 1980 the next door *207 neighbor had heard the father shouting threats to the minor and the minor's sibling between 1 a.m. and 6 a.m., as well as sounds of physical beatings of the minor and the minor's siblings during the same hours. (See fn. 3 for the specific wording of the amended Apr. 14 petitions.)
At the hearing on April 16 on the request for a continuance, appellants' counsel informed the court that she had received the last amended petition on April 14 and the probation officer's report on the morning of the 16th and that she needed additional time for investigation of the new allegations. The district attorney informed the court that he had supplied appellants' counsel with information about the complaints of the neighbors in the previous week and had alerted counsel that an amended petition would be filed to include those allegations.
Appellants mistake the import of section 353, which provides for advising the minor and his or her parents of the right to counsel and the appointment of counsel if requested. The section further provides that "[t]he court shall continue the hearing for not to exceed seven days, as necessary to make an appointment of counsel, or to enable counsel to acquaint himself with the case, or to determine whether the parent is unable to afford counsel at his own expense, and shall continue the hearing as necessary to provide reasonable opportunity for the minor and the parent ... to prepare for the hearing." (Italics added.)
The court thus has discretion to determine whether a continuance is necessary. We find no abuse of discretion in the case before us. Appellants' counsel had been apprised more than two weeks before the hearing that the basic allegation in the petitions was excessive discipline imposed by the father. The amended petitions of April 14 merely added evidentiary matter to support that allegation.
The judgments are affirmed.
White, P.J., and Feinberg, J., concurred.
NOTES
[1] Unless otherwise specified, all references hereafter will be to the Welfare and Institutions Code. As relevant, section 300 provides: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court:

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control....
".... .... .... .... . .
"(d) Whose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents, or of his guardian or other person in whose custody or care he is."
[2] The petition for Marlee was dismissed and she was returned to the custody of her grandmother after the Idaho adoption decree had been confirmed.
[3] The allegations in the amended petitions found to be true are (1) on March 24, 1980, the minors' sibling, Marlee R., was placed in protective custody because she was observed to be suffering from numerous bruises about her buttocks, thighs, and lower back, which were inflicted by her father while residing in the family home; (2) on October 28, 1975, a section 600, subdivision (a) [§ 300, subd. (a)] petition was sustained on behalf of the minor boys in that there was no food kept in the house, the home was found to be in a disheveled condition; Eric received numerous marks and welts as a result of excessive and unusual discipline by the natural father in the family home on July 22, 1975, and as a result, the minors were placed in a foster home placement, where they remained for approximately one and one-half years before being returned to the family home; (3) on March 28, 1980, the minors said they did not wish to return home because of excessive discipline routinely inflicted on them by their father; (4) between January and March 1980, the next door neighbor to the minors' residence had heard their father shouting threats at said minors and their sister during the early morning hours between 1 and 6 a.m., as well as hearing sounds of physical beating of the children.
[4] Appellants do not challenge the standard of proof used by the trial court except insofar as such a challenge is usually implicit in an assertion that the evidence is insufficient to support the court's findings. The standard of proof required for a finding that a child is a dependent child within the meaning of section 300 is a preponderance of the evidence. (§ 355; In re Nicole B. (1979) 93 Cal. App.3d 874, 882 [155 Cal. Rptr. 916].) The standard required in section 300 proceedings to support a finding that continued custody in a parent would be detrimental to the child is unsettled. (See fn. 5, infra; Otterson, Dependency and Termination Proceedings in California  Standards of Proof (1979) 30 Hastings L.J. 1815.) Since the trial court used the clear and convincing standard for its findings, we do not reach this question.
[5] Section 361, deriving from section 726, was enacted in 1976 (Stats. 1976, ch. 1068, § 10, p. 4773), and provides in relevant part that "no dependent child shall be taken from the physical custody of a parent ... unless ... the court finds one of the following facts:

"(a) That the parent ... is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the minor.
"(b) That the welfare of the minor requires that his custody be taken from his parent...."
Section 361 does not contain any provision relating to the standard of proof for removing a minor from the home, although section 361.5, relating to a demonstration county only, directs that no dependent child shall be taken from the physical custody of his parents unless the court finds by "clear and convincing evidence" that one of the enumerated conditions exists.
[6] Section 358.1, relating to the contents of the social study, was added to the Juvenile Court Law after the proceedings in the case before us. (See Stats. 1980, ch. 716, § 1, p. 2140.) That section provides in part that the social study shall include "(b) What plan, if any, for return of the child is recommended to the court by the county welfare department or probation officer."