[No. F006312. Fifth Dist., Jan. 28, 1987.]

In re MICHAEL S. et al., Persons Coming Under the Juvenile Court Law.
KINGS COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and
Respondent, v.
MARDELL Y., Defendant and Appellant.

**COUNSEL**

James H. Jahn and James A. Wainwright, under appointments by the Court of Appeal, for Defendant and Appellant.

Robert R. Maline, District Attorney, and Robert A. Caietti, Deputy District Attorney, for Plaintiff and Respondent.

Peter C. Carton, under appointment by the Court of Appeal, for Minors.

**OPINION**

HAMLIN, J.—Mardell Y., the mother of three dependent children, Michael S., Latasha S., and Julise J. (collectively the minors), appeals from the dispositional order of the Juvenile Court of Kings County following a hearing on a supplemental petition filed in that court under Welfare and Institutions

Code section 387.[1] Mardell Y. (hereafter mother) contends the court committed reversible error in failing to include in the dispositional order removing the minors from her custody some provision for further reunification services. Under the particular facts of this case we conclude further reunification services were appropriate and the trial court abused its discretion in failing to provide for them in its dispositional order; we will reverse the judgment.

### Procedural and Factual Background

On June 30, 1983, petitions were filed in the Juvenile Court of Stanislaus County alleging the minors came within the provisions of section 300, subdivision (d), i.e., their home was unfit because of mother's alleged abuse of Michael. The petition stated mother had struck Michael in the forehead with an unopened can of soda, causing a two-inch gash which required seven internal and three external stitches to close. At the jurisdictional hearing the court found the allegations true and determined the minors were persons described by section 300, subdivision (d). It returned Latasha and Julise to mother's custody and placed Michael with his maternal uncle. The Stanislaus County Juvenile Court ordered the case transferred to Tulare County where mother then resided; Tulare County accepted the transfer on August 15. Thereafter Michael was moved to the home of his maternal grandfather.

Following a dispositional hearing on September 15, 1983, the Tulare County Juvenile Court adjudged the minors dependent children of the court and removed Michael from his mother's custody. The court's order incorporated the reunification plan recommended by the social worker. That plan provided: "Latasha and Julise are placed with the mother already. Michael is placed with the maternal grandparents. It is not considered to be in his best interest to be placed in the home of his mother.

"In order to have the minors returned to her, the mother must do the following things:

"1. Keep the social worker informed at all times of her whereabouts and of significant changes in circumstances within the family.

"2. Maintain regular visitation with Michael. Mother may make own visitation arrangements with the grandparents. Visitation is to be supervised at the discretion and direction of the social worker so that interaction with the mother may be observed.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

"3. Mother must enroll in and satisfactorily complete a series of parenting classes aimed at learning better methods of parenting. She may make her own arrangements or the social worker will make a referral and arrange an appointment. She is not to miss any sessions. Transportation is her own responsibility. She is to sign a consent authorizing exchange of information with the class leader.

"4. Mother must enter and complete a program of personal counseling aimed at resolving her conflicts and learning better ways to handle her anger. She may make her own arrangements or the social worker will make a referral and arrange the first appointment. If she chooses to make her own arrangements she must make an appointment and notify the social worker of the appointment within two (2) weeks of this hearing date. She is not to miss more than two (2) appointments in six (6) months without a valid excuse approved by the social worker. Transportation is her own responsibility. She is to sign a consent authorizing exchange of information with the therapist.

"5. Mother must be cooperative with the social worker and Child Protective Services. She is not to be abusive to the social worker.

"The parents are hereby notified that if they do not cooperate in the reunification plan they could lose custody of their children permanently."

A six-month-review hearing was held on March 16, 1984. The social work report prepared for that hearing indicated the social worker observed Latasha and Julise in six home visits with their mother. The appearance and actions of both girls suggested they were receiving appropriate care. As to mother's compliance with the reunification plan, the report noted that she had kept the agency informed of her whereabouts and had frequently visited with Michael. However, mother had attended only two of eight parenting class sessions as the result of being "hindered by Court appearances in Stanislaus County and the sentence served in January." The mother had had several sessions with a counselor at Kings View Mental Health Services, and Michael had gone with her to two of the sessions. Her cooperation with the social worker was described as "very satisfactory." The mother advised she had enrolled in classes in (1) child development and (2) marriage and family at the College of the Sequoias. The report recommended that Michael be returned to his mother's physical custody but that all minors be readjudged dependents of the juvenile court. The mother and Michael were to continue mental health counseling, and the mother was either to complete the college courses in which she was enrolled or to complete the parenting classes as originally recommended. Neither adoption nor legal guardianship was considered since "reunification is the plan of choice." An order of the juvenile court was entered accordingly.

On July 6, 1984, before the scheduled review hearing on August 31, 1984, the minors were again detained based on allegations that Latasha, and possibly Michael, had been sexually molested. A supplemental petition was filed in Tulare County as to each of the minors on July 16, 1984. Based on the mother's change of residence from Tulare County to Kings County, a social work report was prepared on July 2, 1984, indicating the mother had dropped out of the classes at College of the Sequoias and had made at least two changes of residence (county to county) without advising Tulare County personnel. Thus, the social worker felt there was no way to assess the mother's present compliance with the terms of the reunification plan, presumably including the requirement that she return to and complete the parenting classes if she did not complete the junior college classes at College of the Sequoias. Since this report predated the second detention, it did not consider the allegations of sexual abuse. After some confusion about the filing of the supplemental petition in Tulare County, it was dismissed and all matters were transferred to Kings County where the mother resided.

A "supplemental" petition was filed in Kings County on September 11, 1984, alleging the minors were persons described by section 300, subdivisions (a) and (d), in that (1) they had no parent exercising proper care and control over them and (2) their home was unfit because of the depravity of either or both parents. More specifically, this petition alleged that Michael and Latasha had been sexually molested by Derrick J., the mother's boyfriend and the natural father of Julise, and that mother was aware of the molestation and may have been actually involved in the touching of Michael. The petition further stated that "[m]edical information by Dr. John McCann, Valley Medical Center, verify [sic] that all three minors have been sodomized and vaginal penetration is evident on Latasha [S.]"

A supplemental social work report was filed on September 27, 1984, and in describing the hearing for which it was prepared, the social worker stated, "Proposed acceptance of case on transfer from Tulare County Juvenile Court. Dispositional Hearing on Supplemental Petition. Permanency Planning Hearing for the minors." In her evaluation of the case, social worker Margerene Wilcots stated in part: "The minors have been dependent children of the Court for fourteen (14) months. The reunification recommendations have not been followed through. With the new allegations of sexual abuse and medical evidence to support the allegation, it appears the minors are at greater risk than they were at the time of the initial petition. [Mother] is currently incarcerated in Kings County Jail on charges of child abuse. It seems unlikely that reunification can be affected [sic] in the next six months, therefore it is recommended that a Permanency Planning Hearing be held at this time pursuant to Section 366.25 of the W&I Code.

"Reunification has been unsuccessful. The minors are at risk with the mother. The mother has (according to the minors) allowed Mr. Derrick [J.] to sexually abuse the minors and she also participated in the abuse. Considering the state regulations that set time frames for reunification services (twelve months before a Permanency Planning Hearing) it seems appropriate to refer the minors for permanent planning. A permanent plan will be pursued including referral for adoption, if appropriate." Ms. Wilcots made the following pertinent recommendations: "1. children remain dependent children of the Court under care, custody and control of the Department of Social Services;

"2. all reasonable efforts have been made to prevent or eliminate the need for removal of the children from their home and to make it possible for the children to return to their home;

"3. the Court finds a substantial risk of detriment to the physical or emotional wellbeing of minors exists if returned to the parents;

"4. the Court finds there is no substantial probability that the minors can safely be returned to their parents within six months;

"5. minors continue in foster care;

"6. the Court finds that the parents have not fully cooperated in the services provided and ordered and finds that no further services toward reunification would be appropriate;

"7. the Court orders Permanency Planning for the minors;

". . . . . . . . . . . . . . . . . . . ."

Following numerous continuances granted for a variety of reasons, a contested jurisdictional hearing was finally held on March 29, 1985. With respect to Derrick J., father of Julise J. and "stepfather" of Michael S. and Latasha S., the court made the necessary jurisdictional finding that the minors were persons described by section 300, subdivisions (a) and (d). Regarding disposition, the court found "a substantial risk of detriment to the physical or emotional wellbeing of minor exists if returned to the parents/Derrick [J.]"

The hearing was then continued to April 4, at which time the mother admitted allegations of the petition *as amended*. The amended petition merely alleged that the minors "were placed in a position to be physically abused by their mother MARDELL [Y.] living with [DERRICK J.]; that MARDELL

[Y.] had an oportunity [*sic*] to remove the said minors from this position but failed to do so which resulted in all three minors being physically abused." Disposition was set for April 18. The supplemental social work report prepared for the dispositional and permanency planning hearing indicated that on January 30, 1984, mother had pleaded nolo contendere to one count of violating Penal Code section 273a, subdivision (1), child abuse or endangerment.

Again, numerous continuances intervened, and a contested dispositional hearing began on September 19, 1985. On September 27, the court made the following pertinent findings:

"(X) Remain a dependent child of the Court under care, custody and control of the Department of Social Services.

". . . . . . . . . . . . . . . . . .

"(X) All reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home and to make it possible for the child to return to his or her home.

"(X) The Court finds a substantial risk of detriment to the physical or emotional wellbeing of minor exists if returned to the parents.

"(X) The court finds there is no substantial probability that the minor(s) can safely be returned to their parents within six months.

"(X) Minor(s) continue in foster care.

"(X) The Court finds that the parents have not fully cooperated in the services provided and ordered and finds that no further services toward reunification would be appropriate.

"(X) The Court orders Permanency Planning for the minor(s).

"(X) The Court orders case plan.

". . . . . . . . . . . . . . . . . ."

*Discussion*

Whether the Kings County Juvenile Court committed reversible error in failing to order further reunification services as part of the dispositional

order it entered on September 27, 1985, is the single issue presented on this appeal.

■ Mother argues, and counsel for the minors concurs, that California Rules of Court, rules 1391 and 1392,[2] require notice and a bifurcated hearing procedure on a supplemental petition, i.e., an initial jurisdictional hearing distinct from a later dispositional hearing, just as on an original petition under section 300. Based on that procedural similarity, mother asserts that a reunification plan is required as part of the dispositional order on a supplemental petition the same as on an original petition when the purpose is to remove a dependent minor from parental custody. ■ Although applicable statutes and rules seem to contemplate similar procedural steps on original and supplemental petitions, we believe a further reunification plan is not required in all cases. To conclude otherwise could defeat the state's interest in assuring that children whose parents are incapable of providing a secure and stable environment for them are given an alternative opportunity for such a home life within a reasonable time.

Rule 1392(d)(2) provides, "The procedures relating to disposition hearings prescribed in chapter 8 (commencing with rule 1371) shall apply to the determination of disposition on a supplemental petition." Rules governing cases petitioned under section 300 begin with rule 1376, which provides at subdivision (b): "Prior to every disposition hearing, the probation officer or social worker shall prepare a social study of the minor, which shall contain those matters relevant to a proper disposition of the case and a recommendation for the disposition of the case. If a recommendation is made to remove the minor from the home, the probation officer or social worker shall also include in the social study a recommended plan for reuniting the minor with the family. The social study shall be furnished to all parties at least 48 hours prior to the commencement of the disposition hearing by depositing copies with the clerk. A continuance of 48 hours shall be granted upon request of any minor, parent or guardian who has not been furnished the social study in accordance with this rule."

Rule 1376(b) effectuates the mandate of section 361, which provided in pertinent part at the time of the 1985 proceedings at then subdivision (f): "(f) In any case where a minor is removed from a parent's or guardian's custody for one of the reasons in paragraphs (1) to (4), inclusive, of subdivision (b), or because of severe physical abuse inflicted by a person other than the parent or parents pursuant to paragraph (5) of subdivision (b), the juvenile court shall order the probation officer to provide child welfare services

---

[2] All further references to rules are to the California Rules of Court, unless otherwise indicated.

to the minor and the minor's parents or guardians for the purpose of facilitating reunification of the family within a maximum time period not to exceed 12 months. When counseling or other treatment services are ordered, the parent shall be ordered to participate in such services, unless such participation is deemed by the court to be inappropriate or potentially detrimental to the child. Services may be extended up to an additional six months if it can be shown that the objectives of the service plan can be achieved within the extended time period. Physical custody of the minor by the parents or guardians during the 18-month period shall not serve to interrupt the running of the period. . . ." Not surprisingly in light of the mandatory language of the statute and the rule, "failure to formulate an adequate reunification plan [has] been held to be reversible error under rule 1376(b)." (*In re John B.* (1984) 159 Cal.App.3d 268, 275 [205 Cal.Rptr. 321], relying upon *In re Bernadette C.* (1982) 127 Cal.App.3d 618, 625-626 [179 Cal.Rptr. 688]; *In re Jeremy C.* (1980) 109 Cal.App.3d 384, 388-393 [167 Cal.Rptr. 283]; see also this court's opinion in *In re Jeanette S.* (1979) 94 Cal.App.3d 52, 61 [156 Cal.Rptr. 262].)

Nevertheless, it is equally well settled, and clearly a matter of common sense, that a reunification plan "must be appropriate for each family and be based on the unique facts relating to that family." (*In re Edward C.* (1981) 126 Cal.App.3d 193, 205 [178 Cal.Rptr. 694].) Thus, when a petition is brought to *modify* a prior juvenile court order by removing a dependent child from parental custody, it is self-evident there is a history of that particular family's involvement with the department of social services, child protective services and/or other appropriate agencies which should be taken into consideration in formulating a reunification plan particularized to that family. It would be unrealistic under the circumstances of a section 387 supplemental petition to require the department of social services, the probation officer, or the court to mechanistically institute a reunification plan without regard to the family's prior history. Such a requirement could conceivably result in an endless cycle of "successful" reunification, resulting in return of a dependent child to parental custody, only to have the child reenter the system pursuant to a petition to modify and another disposition when a parent again failed to provide the stable and secure environment to which the child is entitled.

Here, the mother lost physical custody of Michael following a jurisdictional finding that Michael was a person described by section 300, subdivision (d), in that his home was unfit because of his mother's cruelty. At the ensuing dispositional hearing and pursuant to the recommendation of the social worker, Michael was adjudged a dependent child of the juvenile court and his physical custody given to his maternal grandfather under the supervision of the department of public social services. At that time, a reunification

plan was ordered by the court, requiring that the mother (1) keep the social worker informed of her whereabouts, (2) maintain regular visitation with Michael, (3) satisfactorily complete a series of parenting classes aimed at learning better methods of parenting, (4) complete a program of personal counseling aimed at resolving her conflicts and learning better ways to handle her anger, and (5) cooperate with the social worker and child protective services.

Following the six-month-review hearing on March 16, 1984, the court ordered that Michael be returned to the physical custody of mother, but dependency was continued based on mother's failure to comply with the reunification plan insofar as she had not completed the requisite parenting classes. Thus, when the allegations that Michael had been sexually abused surfaced in July 1984, a supplemental petition pursuant to section 387 was appropriate since it was then necessary to modify the court's order of March 16, 1984, and to again remove Michael from his mother's physical custody. Nevertheless, the juvenile court on hearing the section 387 petition would be derelict in its responsibilities if it ignored the six months of reunification services offered to mother during the time Michael was not in her physical custody (Sept. 1983 through Mar. 1984) as well as the ongoing court order in the dependency proceeding that she complete junior college classes in child care and marriage and family in lieu of the parenting classes previously ordered. To construe section 361, subdivision (f)[3] and rule 1376(b) to require the department of social services and the juvenile court to return to square one with respect to reunification efforts simply because a parent has succeeded in regaining physical custody of a child would scuttle the purpose of the statute merely to preserve its form.

We believe it is more reasonable to construe these statutes and rules as mandating the court to formulate and order an adequate reunification plan only in the first instance, i.e., in the initial disposition on a section 300 petition. Failure to order additional reunification services when a child's custody is taken from a parent incident to a section 387 petition is reversible error only if under the particular facts of the case the juvenile court judge abuses his or her discretion in failing to order such services.

Our conclusion is consistent with newly enacted additions and amendments to the Civil Code and the Welfare and Institutions Code, effective January 1, 1987, which reflect legislative recognition that a minor, already a dependent child and subject to the supervision of the juvenile court, must be considered in light of his or her particular circumstances, including prior efforts at reunification, when the minor appears before the court on a supple-

---

[3]See now section 361.5.

mental petition. (See, e.g., Civ. Code, § 232, subd. (8) [amended by Stats. 1986, ch. 1122, § 1] and Welf. & Inst. Code, § 361.5 [added by Stats. 1986, ch. 1122, § 13].)

 Moreover, decisional law makes clear that the juvenile court may consider services rendered to and efforts made in connection with dependent siblings when deciding the appropriate disposition for a dependent child of the juvenile court. (See, e.g., *In re Michael S.* (1981) 127 Cal.App.3d 348, 357-359 [178 Cal.Rptr. 546]; *In re Edward C., supra,* 126 Cal.App.3d 193.) We can conceive of no legally compelling reason why this same reasoning should not apply when a court must make sequential dispositional orders affecting the same child. Section 387 provides that the jurisdictional fact necessary to modify a previous order by removing a child from the physical custody of a parent is that "the previous disposition has not been effective in the rehabilitation or protection of the minor." (§ 387, subd. (a), see also rule 1392(d)(1)(B).) Implicit in this jurisdictional finding is the determination that the reunification services already provided have been ineffective in remedying the problem which led to the child's dependency status. Hence, a juvenile court in making a supplemental disposition must exercise its discretion with respect to what, if any, further reunification services are to be ordered. Therefore, what we are required to determine here is whether the trial court abused its discretion in failing to order further reunification services for the minors.

 The petition filed on September 11, 1984, in the Kings County Juvenile Court underlying the dispositional order from which mother now appeals is denominated "Supplemental." However, that petition alleges jurisdictional facts in the language of an original proceeding under section 300, subdivisions (a) and (d). Similarly, in finding these allegations true, the juvenile court established jurisdiction for an original petition, since the requisite jurisdictional finding for a supplemental petition is that the previous orders have been ineffective in protecting the minors, a finding not made by the juvenile court in this case. Nonetheless, mother, respondent department of social services, and counsel for the minors have all proceeded to address the issue and brief the case as an appeal from a dispositional order following a supplemental petition, i.e., one brought under section 387. This court is thus required to weigh the court's findings against those which should have been made to determine their legal sufficiency. Regardless of the title of the petition, the factual allegations are sufficient to give the required notice to mother of the conduct which allegedly gave rise to the need to remove the minors from her home. (See *In re Fred J.* (1979) 89 Cal.App.3d 168, 175 [152 Cal.Rptr. 326].)

The September 27, 1985, dispositional order modified the March 16, 1984, order of the Tulare County Juvenile Court that Michael be returned

to his mother's physical custody. The earlier order implied a finding that Michael could be adequately protected from the physical abuse which gave rise to his dependency in the first instance by the supervision of the social worker while he remained in his mother's home. In accepting mother's admission of the amended petition, the court necessarily found that the mother's actions had placed the minors in a position to be physically abused by Derrick J. and that mother had had an opportunity to remove them from this position but failed to do so, resulting in physical abuse to all three minors. Obviously, if mother's actions had placed the minors in a position of jeopardy such that they were actually physically abused, the prior order permitting Michael to return to mother's home under supervision had been ineffective in protecting him. Thus the court's jurisdictional findings were the functional equivalent of the requisite jurisdictional finding on a supplemental petition, i.e., the previous orders had been ineffective in protecting the minor. Since the express purpose of a proceeding under section 387 is to remove a dependent minor from parental custody, that aspect of a dispositional order (the placement of the minor) seems self-evident once the jurisdictional facts have been determined. What then remains for determination is the adequacy of the dispositional order with respect to further reunification services.

Mother contends the social worker was incorrect in taking the position that under section 366.25 reunification services were limited to a period of twelve months, with one possible six-month extension. She argues the social worker misinterpreted the statutory focus of permanency planning since it provides for options other than adoption, such as legal guardianship or long-term foster care, in which case reunification services might still aid in bringing the family back together.[4] She points out that there was never a reunification plan with respect to Latasha and Julise since they were never out of her custody. Thus, mother urges she was entitled at a minimum to a reunification plan for the girls. Finally, mother contends that since the circumstances which gave rise to the detention of her children in July 1984, i.e., sexual molestation by Derrick J., differed from the circum-

---

[4]While permanency planning does not equate in all instances to a termination of parental rights to free a dependent child for adoption, mother seems to obscure the distinction between *reunification services* which are ordered by the juvenile court and which must be provided for or arranged by county welfare agencies and reunification efforts which may be pursued by the parent on his or her own initiative. *By law,* reunification services as such *may* not exceed twelve months with one possible six-month extension. (§§ 361.5, 16507.) Whatever permanency plan is ordered by the juvenile court, mandatory reunification services cannot exceed 18 months. Of course, when the permanency plan does not look to adoption but instead to legal guardianship or long-term foster care, a parent may continue to independently pursue any avenues open under the court plan, including maintaining regular visits with the minor and participating in counseling, parenting classes, or other programs designed to improve parenting skills, with the ultimate goal of demonstrating to the juvenile court such changed circumstances that future reunification of the family may be possible.

stances originally leading to dependency, she was entitled to a reunification plan geared specifically at this "new" problem instead of the reunification plan designed to correct mother's own physical abuse of Michael. The brief filed on behalf of the children focuses primarily on the alleged total lack of any reunification plan for Latasha and Julise.

Factually, Kathy Guerra, the social worker who testified at the September 1985 dispositional hearing, made clear that the Kings County Department of Social Services had never formulated a reunification plan. Nevertheless, it is apparent from the context of Guerra's testimony that aspects of the reunification plan which had been put in place by the Tulare County Juvenile Court were still operative and compliance was encouraged by the Kings County Department of Social Services. Guerra testified that mother had had numerous visits with her children, and, more importantly, that Guerra had tried to direct her into available parenting classes.

■ With respect to Michael, then, who had been adjudged a dependent child of the juvenile court on September 29, 1983, and for whom reunification services had then been ordered, section 366.25 limited such services to a period of 12 months, at the end of which time, or no later than October 1, 1984, Michael was entitled to a permanency planning hearing. Even though the statute permits continuation of reunification services for an additional six-month period, such an extension is possible only if the juvenile court at the permanency planning hearing determines there is a reasonable possibility the family can be successfully reunited within that time. The fact that mother had regained Michael's physical custody on March 16, 1984, did not toll the running of the 12-month period since Michael's dependency status was not terminated and since mother was ordered to complete that element of the reunification plan, i.e., approved classes at College of the Sequoias in lieu of parenting classes, with which she had not then complied.

Approximately nine months of reunification services had been provided to mother when, in July 1984, Michael was again removed from her physical custody because of renewed allegations of abuse. Moreover, the record suggests that even after Michael's second detention and the transfer of the case to Kings County, where mother was residing, in September 1984, mother continued to receive some help from the Kings County Department of Social Services directed toward the reunification plan which had been formulated in Tulare County and which was still in effect since Michael was still a dependent child of the juvenile court. As the social worker testified, these services consisted of arranged visits with Michael (as well as his sisters) and somewhat limited direction to appropriate local counseling services.

It is the limited nature of the reunification services provided to mother after the case was transferred to Kings County which concerns us here. In voicing this concern, we do not ignore the mother's contribution to some of the pitfalls which plague this case. For example, it is hardly surprising that a case which underwent two intercounty transfers in less than a year developed some procedural irregularities because of differences in internal operating procedure. Moreover, as we have previously mentioned, mother was free at all times (subject, of course, to the status of ongoing criminal proceedings) to pursue those aspects of the reunification plan, such as completion of parenting classes and counseling, which she knew remained an area of concern to the social workers monitoring her case. Mother's expressed willingness at the September 1985 dispositional hearing to comply with court orders that she submit to counseling or attend classes must be considered in conjunction with the fact that she took no independent action to satisfy these goals.[5]

However, the record makes equally clear that from the inception of proceedings in Kings County, the focus of the social services department was, if not immediate termination of mother's parental rights, at least initiation of permanency planning, including assessment of adoptability, with no further provision of services whatsoever to mother. This is the recommendation reflected in the first social work report prepared by the Kings County Department of Social Services in September 1984. While as to Michael, at least, permanency planning was legally required based solely on passage of time, we cannot ignore the six-month-review report prepared in March 1984 by the Tulare County Department of Public Social Services. That report, based on an ongoing working relationship with the mother, reflected compliance with the existing reunification plan in all aspects but one, and as to that element, completion of parenting classes, the Tulare County Juvenile Court was persuaded to substitute the mother's completion of comparable junior college classes. Moreover, mother's cooperation with the Tulare County Department of Public Social Services was described as "very satisfactory."

It requires little speculation to observe that something happened between March 1984 and July 1984, when the minors were detained, to disrupt the mother's apparently sincere efforts to maintain her family and to comply

---

[5]The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not served by forcing the juvenile court to go "on hold" while the parent makes another stab at compliance.

with the court-ordered reunification plan. While we could assume that mother's interest in completing the requirements of the plan dissipated after she regained physical custody of Michael, such an *assumption* would be improper since it impacts so heavily on the fundamental parenting right and no evidence establishes this speculation as *fact*. It is this breakdown in mother's commitment to completing the Tulare County reunification plan which should have been explored by the Kings County Department of Social Services when the case was transferred to them; exploration into these apparently changed circumstances required a degree of objectivity which is not apparent in a foundational premise that reunification efforts have been unsuccessful and should be terminated.

Of course, the Kings County Department of Social Services had to consider the circumstances immediately surrounding the detention of the minors in preparing its report to the juvenile court, and we do not question the seriousness of these circumstances. At that time mother was in jail on charges of child abuse based on evidence the children had been sexually molested by mother's boyfriend (and the natural father of Julise) and statements allegedly made by the minors that mother had knowingly permitted the abuse or had actually participated in it. However, these *allegations* were simply that—at the time the social work report was prepared mother had not been found guilty of any wrongdoing with respect to the minors. Moreover, even allegations as serious as these would not sustain taking physical custody of the minors from the mother unless the juvenile court found them true by clear and convincing evidence and unless the court further found no other means existed to protect the minors from further abuse.

Additionally, while not without its weaknesses,[6] mother's contention that she was entitled to reunification services specifically tailored to the problem which led to the removal of the minors from her physical custody, i.e., the sexual abuse by Derrick J., has some merit. Since the focus of reunification services is to remedy those problems which led to the removal of the children, a reunification plan formulated to correct certain parental deficiencies need not *necessarily* address other types of conduct, equally deleterious to the well-being of a child but which had not arisen at the time the original plan

---

[6]Mother's contention that she was entitled to a reunification plan tailored to the allegations that she had permitted the minors to be sexually abused is not entirely consistent with the parenting deficiency mother acknowledged in pleading nolo contendere to a charge of child endangerment. Mother's attorney was emphatic at the time mother admitted the allegations of the amended petition that she knew nothing of any sexual abuse and had merely failed to remove her children from a dangerous situation in which they "could have been" physically abused by Derrick J. While these positions are facially inconsistent, the process of criminal plea bargaining is such that the existence of a factual basis for her plea does not absolutely rule out the possibility of other facts, which could have been developed by the department of social services and which might have supported mother's contention in this regard.

was formulated. Admittedly, the more divergent the behavior, the more persuasive an argument that a revised reunification is required when a parent's subsequent actions result in a minor being again removed from the home after an initial detention. For example, a parent who has lost physical custody of a minor due to neglect, such as in a "dirty house" case, and who regains custody after compliance with a reunification plan focused on neglect may have gained little from that plan in the way of parenting skills necessary to protect a child from physical or sexual abuse at the hands of another. Although the conduct in the instant case, i.e., the physical abuse in June 1983 and the sexual abuse in July 1984, is not as dissimilar as that discussed above, to the extent earlier efforts at reunification were directed to helping mother learn to control her temper and to handle a very active child, described by some as a "holy terror," those skills would not necessarily ensure that mother could effectively deal with the sexual abuse of her children by her live-in companion who had, in fact, fathered the youngest of the children being abused.

Finally, the inexcusable delays in this case resulted in the lapse of over a year between acceptance of the case by Kings County and the entry of the dispositional order here appealed from. During this time it seems apparent mother's ability to further reunification with her children was hampered by her prolonged involvement in the pending criminal proceedings. Although mother acquiesced in the repeated continuance of the juvenile proceedings, theoretically to complete the criminal aspect of the case first, we will not assume that mother did so with full understanding of the serious negative consequences such delay would inevitably have on her right to ever regain her children. The delays in this case exceeded those statutorily permitted (see, e.g., § 319.1), and compounded the problems plaguing this case as already discussed.

The deficiencies in the services provided to mother are even more pronounced with respect to Julise and Latasha. As mother points out, no "reunification services," as such, were ever provided with respect to her daughters since, prior to their detention in July 1984, the daughters had never been removed from mother's physical custody. Although as we will discuss, we are not persuaded that mother never had the benefit of *any* services concerning her daughters, we do deem it significant that permanency planning pursuant to section 366.25, upon which the Kings County Department of Social Services relied in its report of September 1984, is statutorily required only when a minor cannot be returned home. While it may be true that neither Julise nor Latasha could be safely returned home in September 1984, at that time they had only been out of mother's physical custody for a period of two months, a time much shorter than that contemplated by the applicable statutory provisions dictating the need for permanency planning.

Admittedly both girls had been dependent children of the juvenile court, based solely on mother's physical abuse of Michael, for a period of over one year, but the focus of the provisions governing permanency planning is not merely dependency status but ensuring safe and secure *placement*. Under these circumstances, termination of reunification services for Julise and Latasha was precipitous.

However, as we have previously noted, we do not accept mother's argument that *no* services were provided for Julise and Latasha, and our conclusion on this issue requires resort to an aspect of the juvenile dependency law which has very little judicial construction. Section 16506 provided at the time of these proceedings: "Family maintenance services shall be provided or arranged for by county welfare department staff in order to maintain the child in his or her own home. Such services shall be limited to six months, and may be extended for two three-month periods if it can be shown that the objectives of the service plan can be achieved within the extended time periods. Family maintenance services shall be available without regard to income and shall only be provided to either of the following:

"(1) Families whose child has been adjudicated a dependent of the court under Section 300, and where the court has ordered the county welfare department to supervise while the child remains in the child's own home.

"(2) Families whose child is in potential danger of abuse, neglect, or exploitation, who are willing to accept services and participate in corrective efforts, and where it is safe for the child to remain in the child's own home only with the provision of services.

" . . . . . . . . . . . . . . . . . . ."

Section 16506.1 provided that "[f]amily maintenance services shall include, but not be limited to, counseling, emergency shelter care, temporary in-home caretakers, out-of-home respite care, teaching and demonstrating homemakers, parenting training and transportation." Family *reunification* services are covered at section 16507; section 16507.1 provides that "[f]amily reunification services shall include, but not be limited to, counseling, emergency shelter care, teaching and demonstrating homemakers, parenting training and transportation."

There are no cases construing the provision of family maintenance services, but it seems clear that when, at the initial dispositional hearing in September 1983, the social worker determined mother's two daughters, Latasha and Julise, could safely be left in mother's home under supervision, the ensuing plan for reunification with Michael was the functional equivalent

of family maintenance services provided for Latasha and Julise. In the original reunification plan specific reference to Michael was made in the only provision that would have applied to him—visitation necessitated by his out-of-home placement. Obviously counseling provided to mother to help her control her temper and deal with her anger in order to avoid physically abusing her children and parenting classes to improve her parenting skills would not merely benefit Michael but would benefit his two younger sisters as well.

■ Thus, when it is clear that family maintenance services have been provided to a family and have been ineffective in avoiding the need to modify the existing order and remove a dependent child from the home in order to protect the child, a judge in making a supplemental disposition is not required to reorder the same services for an additional period of time. Family maintenance services and family reunification services were enacted as part of the same broad amendments to the law governing dependent children in 1982. A review of the legislative history substantiates the similarity of family maintenance services and family reunification services.

In what appears to be an analysis prepared by or in connection with a Department of Finance 1982-1983 budget letter and dated March 2, 1981, the program of child welfare services is described as consisting "of four component services: (a) emergency response, (b) family maintenance, (c) family reunification, and (d) permanent placement. [Senate Bill] 14 [1981-1982 Reg. Sess.] recognizes that an integrated system of child welfare services cannot exist without 24-hour response; that once the child and family have entered the service network every attempt must be made to maintain the child in the home and the home as a unit; that certain criteria must be met before a child is removed from the home and that reunification services be offered; and that the best possible permanent placement plan be designed for each child who cannot be returned home or be adopted."

Obviously, these services are not mutually exclusive, but they should not dissolve into some lockstep process which is blind to the particularized consideration of individual cases. Certainly the legislative history suggests a progression from emergency response to maintenance of the family to reunification of the family to permanent placement of the child outside the family. But this history is consistent with a legislative intent to rely in large part on the discretion of a well-informed, well-educated, and sensitive juvenile court to address the specific need in any particular case. Children are often immediately removed from the home for their protection, and reunification services are instituted without any intervening time for family maintenance services. Particularly since the services as specified in sections 16506.1 and 16507.1 are virtually identical, when an attempt has been made to main-

tain the family unit by the provision of family maintenance services but this attempt has failed, the juvenile court should not be compelled to engage in the idle exercise of ordering the same services again and thus prolonging the time a dependent minor is without a safe and stable placement.

■ The same reasons that persuaded us the Kings County Department of Social Services did not provide adequate "reunification" services with respect to Michael also persuade us that the family maintenance services for Latasha and Julise failed to satisfy the county's statutory obligation. Thus, under the totality of the circumstances in this case, the trial court abused its discretion in failing to provide in its dispositional order of September 27, 1985, for further reunification services.

The code contemplates an additional six-month period for provision of services beyond the initial year of out-of-home placement if it appears reunification could succeed in the extra time. A similar time period is warranted now, during which time the Kings County Department of Social Services must undertake a serious and objective assessment of mother's ability to successfully complete a reunification plan and regain physical custody of her children. We do not, and the juvenile court cannot, ignore the effect of the passage of time—some two and one-half years—on the feasibility of a reunification plan. The evaluation of the current status and well-being of the minors are matters particularly within the purview of the department of social services and the juvenile court. Our decision herein requires only that the appropriate agencies undertake this inquiry in good faith.

The judgment is reversed.

Franson, Acting P. J., concurred.*

---

*Due to the illness of Hanson (P. D.), J., who participated in the argument and the unanimous decision of the panel, this opinion is signed by the two remaining justices. (*People* v. *Castellano* (1978) 79 Cal.App.3d 844, 861-862 [145 Cal.Rptr. 264].)